Nick Whalen May it please the court, my name is Nick Whalen. I'm here on behalf of the third party defendant, appellant Roger Allen Porter II. He is the administrator ad litem for the estate of Roger Porter. This nine year old case has a long history, but it nevertheless we think today presents a straightforward jurisdictional question. The plaintiffs in this case were the former employees of AeroFrame. Those are Louisiana plaintiffs. And they sued two defendants in their original petition. They sued Louisiana AeroFrame, their former employer, and they sued Nondiverse ATS. The district court and all of the parties to this case agree that at inception these employees had viable statutory claims against Nondiverse AeroFrame. And we believe under this court's jurisprudence, including the Williams case, Williams v. Homeland, that the existence of that claim between Nondiverse parties destroys jurisdiction. I will address three main points. Well, that's where we decided in Ashford one, but it left open once it got back to state court whether newly discovered evidence might show that essentially AeroFrame had been settled out of the case and therefore it would be appropriate to realign, yes or no. Yes, if AeroFrame in fact settled the case, either before Ashford one was decided or after, I think that could present a new factual basis for removal and a new look at the case. And that was ATS's argument in their second removal, that there was newly discovered. It was the Porter testimony in Tennessee. It was the Cox-Porter-Retainer agreement. And all of a sudden now we've got in writing a resolution, the functional equivalent of a settlement. Isn't that essentially the magistrate's logic that the district court adopted? Yes or no? Well, yes. One of the bases of the magistrate's ruling was ATS's argument in the second notice of removal that it discovered the Cox-Porter-Retainer agreement and that that agreement effectively settled AeroFrame out of the case. Yes, that is the contention. And what's wrong with that analysis? Well, Your Honor, we don't agree that the documents that ATS cites, because it cites not only the Cox-Porter-Retainer agreement, but also the Somer Brown email and conflict waiver signed by the employees. And we believe under Louisiana law, those three documents, whether you look at them individually or whether you put them all together, under Louisiana law, they're not a settlement. Okay, that's the case. What is your best Louisiana case? I'm looking at R.L. Vasquez's authority because it's got to be an unequivocal settlement. And you're saying under Louisiana law, those retainer conflict agreements don't equate to a settlement. What's your best Louisiana case? I'll give you the case name, Your Honor. The point of the case, while I look for it, is that under Louisiana law, you look at the clear and ambiguous words of the contract, and that's how you construe it. But you have to have a release. The terms of the release from liability have to be known for it to be a settlement. And what I've got cited in our brief is a Middle District of Louisiana case, Bombette v. Donovan, which cites Louisiana law, and it quotes Anthony v. Liberty Mutual Insurance Company, which is a Louisiana Third Circuit case. Those cases establish that you have to have a release under Louisiana law, and that's not surprising because without a release, there's nothing to prevent the plaintiffs from going after the defendants again down the line. Here, the documents at issue, none of them, including the Cox Porter Retention Agreement, purport to release any claims against any party. The Cox Porter Retention Agreement does not contemplate the dismissal of any claims against Aeroframe. It accomplished two things. It waived a conflict because the Cox firm was approached for representation by Roger Porter, and it believed it needed a conflict waiver, so conflict waivers were signed by the Louisiana employees of Aeroframe and by Roger Porter, and it also subordinated the claims of Roger Porter and Aeroframe to those of the plaintiffs So the same law firm gets conflict waivers from the plaintiff employees who appear to be suing the Louisiana defendant employer. The same law firm representing both of them gets waivers. Yes, Your Honor. You can see why the magistrate, she has two hearings, December of 2014 and December of 2019, correct? I believe that's right, Your Honor. I'm going to quote something because she, of course, has lived with this case a lot and expressed a lot of views about it. Attorney Brown, in December of 2014, says, you know, I may have been overzealous with that email. I had no authority to speak for Porter. Then goes on to say, there's not one written settlement agreement, and I think you are saying there still isn't. There's no stipulation. Put that aside. Then it goes on to say, nothing indicate Mr. Porter agrees to what I suggest he is agreeing to in my email. Nothing indicating that Mr. Porter agrees to what I'm suggesting. Then we get the retainer agreement, and clearly Mr. Porter has signed and agreed to just what was in the email. Well, I believe – I could be wrong. I believe what she said was he's not agreeing to what was in the fourth paragraph of the email. And I don't have the transcript in front of me, but I believe she was referring to a specific part of the email that related to the stipulation as to the damages sought by the plaintiffs as opposed to the subordination. The subordination, I believe, was discussed with the district court, in briefing with this court, and even in argument before this court. But it was the specific stipulation that I believe Ms. Brown was referring to. So you would or wouldn't accept gross sort of nondisclosure, lack of candor, maybe a conflicts now that means the two employees and the employer can't both be represented by the same firm. But you're saying that that has nothing to do with whether the employees like Ashford can choose to be in Evangeline Parish to shoot their employer. Is that your jurisdictional argument? I think what I'm – yeah, Your Honor, what I'm saying is because there was no actual settlement of the claims where the plaintiffs agreed to release claims. They signed nothing in which they agreed to release claims against error frame that would effectively eliminate error frame from the case or that would constitute a settlement agreement under Louisiana state law. Even though the lawyer for both of them is saying to both, you're never going to be adverse. Our interests are the same. ATS is the deep pocket. Even though the lawyers are saying that internally, emails, retainer agreements, it actually nonetheless doesn't equate to a settlement. Am I correctly stating your position? Yes, Your Honor. That's our position because for one thing, they're signing conflict waivers. I believe that the very fact that they're signing conflict waivers, both the employees and Roger Porter, is because they recognize that there might be continued adversity later on down the line between the plaintiffs and error frame if, for example, ATS is dismissed from the case. If that happens, there's nothing to stop the plaintiffs from continuing to pursue their claims against error frame to recover. That's just one way. Well, counsel, you mentioned the Louisiana case and the absent document here that you say is necessary as a release. That does seem to fit in with the argument that you're making. I need to study the case that you're talking about. But you're saying to be complete under Louisiana law, there needs to be a signed agreement, at least an effective agreement, that there can be no further litigation among these parties, that there is a release. And you don't think the documents that your friend on the other side has provided as evidence do that? Yes, Your Honor. I believe both under Louisiana law you need a release and I think under Vasquez, which gives us the test for the voluntary-involuntary rule, that the local defendant has to be effectively eliminated from the case. That's what Vasquez says if you're going to ignore the citizenship of the nondiverse defendant. I don't think that happens here. I also think that under this court's removal jurisdiction, looking at the intent, going behind valid claims that are asserting at inception and saying that the intent of the plaintiffs was not really to pursue a viable claim against the nondiverse defendant, but the intent of the plaintiffs was instead to target the diverse defendant. I don't think that finds support in this court's removal jurisprudence, which looks at the substantive viability of claims, not subjective considerations such as what were the plaintiffs really trying to do, were the plaintiffs targeting one defendant over another. I just don't think under Williams and other cases that that's supported under this court's jurisprudence. Let me ask you on realignment. It needs to be clear that from the initiation of the case, which I think was October 2013 in state court, that the parties had to be aligned in a way that would support a removal. Is there any real debate, I'm asking you, isn't it clear that these suits would not even have been filed until this alignment had been made? It's one thing to say it's effective and whether it has to be released and whatever else. I'm just asking about timing. If there ever were a line, weren't they aligned from the very beginning? I don't agree, Your Honor. I think it's true that Roger Porter pointed the finger, so to speak, at ATS and told them… My point basically is that Brown is saying I'm not going to bring these lawsuits, she said in her deposition, because there's no money in it. The airframe is defunct. It financially has no resources. So the very fact that litigation was brought, it seems to me, shows the alignment existed at that time. Now, the effect of it legally and whatever, but they were working together from the very beginning. Isn't that a fair assessment? I don't mean that you lose. I'm just saying factually, isn't that how this lines up? I don't believe that they were aligned at inception. My time is up. May I answer this question, Your Honor? I wish you would. I don't believe they were aligned at inception. I do believe that Roger Porter, so to speak, pointed the finger at ATS. But if you look at the sequence of events, Roger Porter did not retain the Cox firm until he was added as a party to the case through a third-party demand. So I don't agree that there was alignment at inception. And, again, going back to this court's jurisprudence, the court has said that a defendant's financial wherewithal and whether or not a defendant might have assets to pay at the end of the case is not to be considered. That was said in the Williams case. So I don't think that ATS's lack of assets factors into the jurisdictional analysis if we're going to stick with what this court has said before about removal. All right, counsel. Thank you. Thank you, Your Honor. Thank you. Camille Gauthier for the plaintiffs. I want to focus my time on an independent obstacle under any theory, and that is the lack of amount in controversy between the plaintiffs and ATS. ATS was the removing party, so it, of course, always bore the burden of demonstrating an amount in excess of $75,000. It fell short. It offered no facts on any employee's rate of wages or the amount of time for which any plaintiff suffered damages. Instead, ATS mistakenly believed that the plaintiff had demanded a 90-day penalty wage against it and that there were trouble damages pled against it. The plaintiffs made no such allegations. So ATS did not meet its burden on amount in controversy with inaccurate assertions and faulty math. Any doubt as to the propriety of removal, of course, should be resolved in favor of remand. As this court has explained in White v. FCI, the removing party fails to meet its burden where, one, the amount is not facially apparent from the petition. Two, the defendant offers only a conclusory statement in its notice of removal, not based on any direct knowledge of the claims. And three, the plaintiff contests removal with an unrebutted affidavit showing the amount in controversy is not met. That is exactly what happened here. ATS had only generalities with no specifics on amount in controversy in its notices, and the petitions were ambiguous as to exactly the amount sought. So Ashford clarified. He explained the limited amount of time for which he was seeking wages, and he even stipulated in a declaration, as this court allows, that he was not seeking and would not accept more than $75,000. The damage theory was the same in these other consolidated cases, but the other plaintiffs were ordered not to file anything that would repeat the facts from Ashford. ATS had no facts to controvert any of the plaintiff's numbers or assertions, and instead it relied solely on wrong facts and wrong math. It first claimed that the plaintiffs had sought 90 days of penalty wages against it. That's untrue. The petitions made clear that the last paycheck cause of action was being pled against Aeroframe, their employer, and Aeroframe only, not ATS. Separate causes of actions were asserted against ATS. ATS next took that falsely inflated 90 days damages amount and then purported to treble it to further inflate the amount of damages. That was also wrong. The plaintiffs' petitions do not plead treble damages anywhere. ATS misunderstood and thought that the plaintiff's statement in the petition that they would be putting the attorney general on notice was a suggestion or implication that they were asking for treble damages. No. The LEPPA statute requires that any assertion of a LEPPA claim be provided to the attorney general, and moreover, treble damages can only be in play if it's pled that there's ongoing conduct after the defendant receives notice from the attorney general. So treble damages are not at issue here. Worse still, ATS purported to add a contingency fee award on top of the already inflated sum and treble that attorney fee award. There's no basis for that. The LEPPA statute at issue never allows for the trebling of attorney fees. And finally, as one last point on amount and controversy, in the Ashford 2 case specifically, this is obviously a second removal and a second time here, in the second notice of removal, ATS fell woefully short of its burden there because all it did, it literally only pled reliance on the district court's earlier order from Ashford 1. They called it law of the case. Of course, this court vacated all of those earlier rulings from Ashford 1, so a removing party obviously cannot meet its burden on amount and controversy by citing only a vacated ruling. Has the math been done now? In other words, have the amounts, the back pay, the penalties, the attorney's fees been confirmed? Sure. So a few answers to that, Your Honor. So in Ashford, there was a declaration filed while the amount and controversy issue was being resolved by the district court. And in that declaration, Ashford did the math as to his hourly rate of wages or his weekly rate of wages, what he was asking for from AeroFrame, what he was asking for from ATS. Later in the record, years later, we see that the plaintiffs moved for summary judgment against AeroFrame. There and only there, because the plaintiffs put it in the record, not anything that ATS did, the plaintiffs put in the record in those summary judgment filings each of their different rates of pay. I thought I saw the judgments were rescinded because in the end the amounts were not accepted by both parties. I'm not sure what you are referring to that the judgments were rescinded. There was earlier in Ashford one, the district court asked for additional briefing on amount and controversy, thinking at first that it was not facially apparent. In Ashford one, the district court later said, I rescind my earlier order and request for additional briefing. I now think it's facially apparent. I'm asking about the summary judgment eventually entered for Ashford against AeroFrame. Those judgments are in play and the judgments accepted the amounts of wages that all of the plaintiffs put forth in those summary judgments. I'm glad you brought those judgments up because they also go to your earlier questioning about settlement. The judgments itself were entered between Ashford and all the other plaintiffs against AeroFrame. There literally are judgments between Louisiana plaintiffs and Louisiana defendants that the district court entered into proving there was no settlement and proving lack. Well, that's an oddity. I don't know if it proves it. It sort of confirms the settlement, it seems to me, and uncontested. I mean, I'm just not sure. It's an odd case. That's why you're here twice, I guess. And it's not a clean case at all. But the fact that there are judgments in a way is recognition that there was no dispute among those parties that were aligned. No, no, Your Honor. No, no? It's actually the exact opposite of what you said. There's a suggestion that the plaintiffs and AeroFrame settled their claims. If we had settled claims, we would not have an actual case in controversy. We could not enter judgments. Ashford and the plaintiffs filed motions for summary judgment. AeroFrame opposed those motions. AeroFrame did not challenge the actual gross rate of wages, nor could it, but it did challenge the imposition of attorney's fees. It did challenge the imposition of penalties. These were litigated summary judgments and resulted in judgments, which, again, we could not have if those parties had settled. And we cannot have, and it's fundamentally inconsistent with diversity jurisdiction, that we now have Louisiana plaintiffs with judgments against Louisiana defendants. So I'll stop there and reserve my time. Thank you. Thank you. May it please the Court? Brett Vann on behalf of Aviation Technical Services, Inc. To pick up where Ms. Gauthier left off, in response to your question, Judge Southwood, the record indicates that the summary judgments that were entered in favor of the plaintiffs against AeroFrame were unopposed on the merits, and we submit confirming, as Ms. Bowne promised in her April of 2014 email, that all along AeroFrame did not intend to and would not oppose the claims of the plaintiffs against AeroFrame. So AeroFrame did not oppose summary judgments? They filed oppositions, Your Honor, but there was no substantive – their argument was a lack of discovery, and they argued subject matter jurisdiction again. But as to the actual amount of the underlying wage claims, there was essentially no opposition. What about as to penalties and attorneys fees? I don't believe that was – I don't have that at my fingertips, Judge, but I don't believe that was part of what was prayed for by the plaintiffs in their summary judgment motions and was not part of what the Court awarded to the plaintiffs. Do you have a Louisiana case where adversity has been eliminated, the parties out on a settlement theory, even though there's a judgment against the employer? I don't have a case on that, Your Honor. I do have a case under the realignment theory, however, to address Mr. Whalen's first points, that this Court has repeatedly indicated that the test is whether the parties with the same ultimate interests in the outcome of the litigation are on the same side of the deal. In this case, including – and that comes from the Court's decision in Griffin in 2010. And in the Griffin case, the Court observed that the two aligned co-plaintiffs, that a claim existed between them, but that the principal purpose of the suit was the claim against the defendant, in this case, ATS. So I would say even the existence of a claim does not preclude realignment under this Court's jurisprudence. Moreover, in Zurn, this Court articulated the bona fide dispute standard, whether a bona fide dispute between two parties precludes realignment. Why our case is distinct from Zurn is that there is no bona fide dispute. We know from the outset, based on the newly discovered evidence that you mentioned at the top, Judge Higginson, that Mr. Porter, on behalf of Aeroframe, was aligned in working with plaintiffs' counsel from before any of these lawsuits were filed. Working with? Okay. I guess let me ask you, because Ashford One's mandate matters, and when I looked at your second removal, you weren't arguing against the mandate in remand, the inception theory. You were arguing a realignment theory. Is that fair to say? Judge Higginson, in our second notice of removal, we were arguing jurisdiction based upon diversity, based upon the discovery of the Cox-Porter retention agreement after this Court's decision in Ashford One. Yes. Newly discovered evidence. Yes, Your Honor. Showing realignment. Because that retainer agreement doesn't predate the lawsuit. That's correct, Your Honor. So at the time we filed the second removal, we had before us some evidence that suggested realignment that is referenced in our notice of removal, specifically an October 1st of 2013 email from Mr. Porter to Summer Brown confirming that he's been speaking with a partner, Mr. Filo, and is sending plaintiffs to the Cox firm to file suit against ATS and Airframe. But, Your Honor, at that time we did not have the additional new evidence that has been discovered in connection with the sanctioned motion proceedings in the District Court, specifically the testimony of Ms. Brown and Mr. Filo that went through the chronology of how in August of 2013 Ms. Brown had no interest in suing Airframe on behalf of these plaintiffs. So is it an inception theory now or is it a realignment theory? The argument that there's no adversity is premised on there never was. I thought that was what we saw in ASHRAE 1. Or is it premised on post-suit we've now got evidence showing that they realigned? Well, I guess I would say it's neither exactly as you said it, Judge Henson. The magistrate judge based her ruling on realignment from before inception based upon the newly discovered evidence. After ATS removed ASHRAE the second time based upon some of that evidence, specifically the Cox border retention agreement. And my difficulty when I'm driving, and I'll be clear, is it would seem that's sort of a second bite at the original theory. Now, it may be that new evidence comes to light, but then was that evidence available? Did you depose border? Did you ask for the retainer agreement? Is it even necessary for you to? But I would have thought at least you would move to recall the mandate based on statements made to this court and the magistrate that were false. But very different from all that is a realignment theory that what's come to light is essentially what Judge Davis wrote in his occurring opinion. That it's now come to light that they settled after the lawsuit was filed and that's not what this court addressed in the first instance. That's correct, Judge. So, Judge Davis, his opinion spoke about the absence of the agreement. And if that suggested that under Vasquez, if that agreement had been known to the court when it decided Ashford won, that there would have been a compromise and Ashford Aerofran becomes a nominal defendant. Okay, and the written agreement, just to be clear, is the retainer agreement that no one had before, arguably was denied perhaps falsely. Yes. But then it does seem you've got to establish that that conflict waiver agreement is equivalent, the functional equivalent of a settlement. That's correct, Judge. And we believe under Article 37.1 of the Louisiana Civil Code that is the missing piece that completes a settlement or a compromise made up of the Summer Brown April of 2014 email offering to the plaintiffs that in exchange for a conflict waiver, Aerofran will not defend against your claims and will prioritize your claims, et cetera. We now have the conflict waiver signed by the employees themselves agreeing to what Ms. Brown offered in her email. And then we have the Cox Porter Retention Agreement, which closes the loop identified by Judge Davis in his concurrence and completes the compromise at that point. Let me pick up just a little bit on that, on what basis might be open to us. I'm trying to understand SWS erectors, which seems to be the key case on this second effort to remove. It does seem to me that what the agreement does, that you're talking about the new evidence, makes a stronger case for realignment from the beginning. But that is just basically more facts to support the same theory as was argued the first time. It is new evidence to support an entirely different theory, which is Judge Davis' concurrence on settlement. Is it your position that realignment was still an open issue despite, because of SWS, not despite, but because of SWS erectors, that you can keep coming up, but it's not summary judgment, you lose, but hey, a week later we got some more evidence, let's make another little run at it. It's not that sort of procedural posture. I mean, what does erectors mean? What can you do when you get more evidence, and what can't you do when you get more evidence under erectors? SWS erectors, Your Honor, says that when you discover new evidence that gives an additional basis for removal. But what does that mean, additional basis? What's the additional basis here, just put it in those terms? New facts that give you a basis. That's back to my summary judgment example. You don't get to do that after summary judgment's over. Is that what erectors mean? You can keep going at this? I mean, some of it may come down to diligence, which has not been an issue here, raised, which is something Judge Higginson mentioned. But is that how you read erectors? We got better evidence on realignment now? Well, in our case, and why erectors permits the second removal in our case, newly discovered evidence that the other side denied existed at the time Ashford One was decided. And SWS erectors— We couldn't have found that they hid it. Is that what makes erectors apply? Well, erectors did not involve, as I recall, non-disclosure evidence. Erectors said if you have a new factual basis and you timely remove based upon that, that is permitted, Your Honor. If there was a straight false denial to the match straight and then to this court, why wouldn't you move to recall the amending? Your Honor, why would you— The timing is important in response to that question, Judge Higginson. So this court's decision in Ashford One was issued in approximately October of 2018. ATS applied, filed a petition for rehearing. Yes. While that petition was pending before this court, Mr. Porter was testifying at his federal trial in Tennessee, at which he testified that he had settled the claims of the plaintiffs and he agreed not to defend against them. This court— Wait, let me just be clear. He did say that I've settled— I'll make sure I get it right, Judge. Because I thought that's where the exhibit comes in and it's the retainer agreement. He offered—that's correct. He offered the retainer agreement as evidence of his— and I want to make sure I get this right— that he would not settle, that he would not oppose the plaintiffs' claims was what he testified in Tennessee. Right. He's always said, I will prioritize them. I want my employees to be paid first. I'll subordinate mine to them. But then years and years pass, and there's a summary judgment against Aeroframe for his employees, and everyone's fighting over the money, the penalties, the attorney's fees. That just still sounds like adversity. It doesn't sound like a settlement and a release. Now, separate from that may be misconduct, conflicts of interest, ethical misstatements, leading to sanctions, perhaps. That's still pending. But does it go to jurisdiction? Does it mean that Mr. Ashford can't choose to sue in state court his employer? Under this court's theory of realignment and the U.S. Supreme Court's theory from City Annapolis, the answer is yes, John. That because we had this communication and cooperation between Mr. Porter, Ms. Filo, and Mr. Brown from before the first suit filed in September 16th of 2013, the Gallows case, yes, under realignment, that is true. What is the relevance to the current state of the case of Aeroframe? We believe, Your Honor, that the relevance of Aeroframe's lack of an existing member at this point following the death of Mr. Porter in September 21 means that it can no longer pursue its appeal before this court, and we filed a motion to dismiss it. So let's say we agree and we dismiss the appeal. Where does that leave this case? So the practical effect is— I'm asking you a hypothetical, not a statement of promise. Understood. The practical effect is two of the 17 appeals go away. Aeroframe is the only appellant in the Neithammer and Jackson cases. Then that leaves you with the remaining 15 appeals, and the only appellants in those cases would be plaintiffs' employees seeking to undo the summary judgment motions in their favor against Aeroframe, with the exception of Mr. Porter II in the Ashford case alone. Proceed. I wanted to address Mrs. Gauthier's arguments about the amount in controversy, and I point this court to Judge Jones's dissent in the Ashford I case, where applying de novo review, Judge Jones reviewed the magistrate's analysis and agreed that it was facially apparent that the amount in controversy in these petitions exceeded $75,000. I would note that in all cases, the claims and the damages prayed for are identical for all plaintiffs. I would also note that in this case, unlike the de novo review applied for Judge Jones, this court should actually apply plain error because plaintiffs failed to preserve a— failed to object to the amount in controversy ruling in their objections to the magistrate judge's reports and recommendations. And I reference page 94 and footnote 240 of our brief for those citations. But Judge Jones, in her opinion in her Ashford I, went through the types of damages plaintiffs had claimed for, and to clarify, the petitions do seek lost wages against ATS. Judge, Magistrate Cage— Stop one second and go back to your saying it would be plain error instead of de novo review. Start that over a little bit. Yes, Judge. In the plaintiff's objections to the magistrate judge's reports and recommendations denying the motions to remand, they did not state an objection to her ruling on the amount in controversy. We raise this in our appellee brief. In their reply, they cite to one of their objections to the report and recommendations from one of the cases, Adams, which they state incorporates by reference previous objections to a previous report and recommendation on the amount in controversy. They have no citations for the other 15 cases. So because they didn't raise amount in controversy under the Douglas decision, plain error should apply to that. But irrespective, I would say, Judge, under either— My concern a little bit is because this is a jurisdictional issue, amount in controversy. I'm not sure about plain error review, but go ahead. Understood, Judge Archdale. And either way, again, Judge Jones applied de novo review and we would submit. In this case, if this court applies de novo review, it should find that the magistrate judge and the district court correctly ruled on the amount in controversy. Because the damages prayed for include lost wages and lost benefits, they also prayed for undefined lost future wages. So no timeline for how long these employees were unemployed and how long the unemployment would last. As Magistrate Kaye noted, they requested attorney's fees under the Louisiana Unfair Trade Practices Act, which does entitle them by statute potentially to treble damages. And in this case, their prayer for damages included a prayer for statutory damages, which, again, under LEPA may include treble damages. As to the stipulation referenced by plaintiff's counsel that Mr. Ashford filed in state court, under this court's decision in Gebbia, which Judge Jones cited in her ruling, because it was facially apparent that affidavit, of course, cannot be considered, and the affidavit was only filed in the Ashford case alone. A couple other notes on the amount in controversy. At the first world... Didn't the judge rule that unless other plaintiffs had an amount different from Ashford's affidavit, they shouldn't file any affidavits? I believe that's a fair characterization, Your Honor. But either way, because we're operating under facially apparent, the affidavit doesn't come in and is not considered. You were back on the sort of settlement, whether there's settlement. I was just looking at the table of authorities. They cited a case I think called Bombette v. Donovan in a oral argument. I'm not seeing it in their briefs. Were you familiar with that case? I am, Your Honor, and I'm happy to address it. And the facts of Bombette are certainly different. Oh, Bombette? Bombette. Okay. Insofar as my understanding, the parties now even reach the stage of drafting a settlement agreement in that case. In the Anthony case that counsel referenced, talking about a form of a release is required, that's contrary to Louisiana law and the Soleil decision that we cite in our case, meaning that no form is prescribed under Article 3071. In the Anthony case, a release was the form contemplated by the parties, but that is not the form contemplated by the three documents that are issued in our compromise here. We've talked about our motion to dismiss Erafraim's appeal. I would also like to briefly address the motion to amend jurisdictional facts that we filed with the court. As laid out in that motion, following the death of Mr. Porter, we were ordered by the district court to give notice to his heirs, and in that exercise we discovered considerable evidence that contradicted what had been argued to this court, that Mr. Porter was a resident and citizen of Louisiana at the time these lawsuits were filed. After putting that evidence together, which we've attached to our motion, and asked the court to take judicial notice of, we submit that we now know that Mr. Porter was actually a citizen of Tennessee throughout these proceedings. This court has... It seems to me you have some evidence that's been attached that creates an argument that he was domiciled in Tennessee at the time. It seems to me a considerable fact dispute probably could be made out of your evidence. It's a difficult argument for us to deal with. We recognize that, Judge Southwick, and we believe upon discovery of this evidence by counsel for ATS that it was a duty of candor compelled us to put that before you and offer it as a... So the facts of this record are clear. Under 28 U.S.C. 1653, this court has allowed those types of amendments even this late in the game, when judicially noticed evidence is undisputed, which appears to be the case here. We cite this court's decision in Swindle, authored by you, Judge Southwick, where parties did not dispute the contents of judicially noticed evidence and permitted amendment even at this stage in the game. Let me ask you about the motion for sanctions. Has that been resolved? Is there an amount that's been imposed? And what relevance might that have on what's before us? Well, the motion for sanctions itself has been resolved, Judge. The district court has adopted the magistrate's recommendation of sanctioning Mr. Filo, Ms. Brown, Araframe, as well as Mr. Porter. I knew there was a report and recommendation. When was the adoption? The adoption of that report and recommendation, Judge, was in the, I believe it was in July of 2020. I don't have that set right before me. And the magistrate has also recommended sanctions in the amount of $1.75 million. That is in a report and recommendation that's in this record at 2230. Okay, that's what's still pending in front of the district court. Correct, Judge. 2230185.4680, and that is still pending with the district court at this time. Those sanctions and the basis for realignment that was correctly found and concluded by the district court are based upon the evidence of misrepresentations and falsehoods about both the Cox-Porter retention agreement that we've discussed and the relationship between Araframe and plaintiffs, where there was no adversity from the beginning of these lawsuits that fully support under the law the finding that diversity jurisdiction exists based upon realignment in this case. Are they not part of this appellate record, I suppose, what you're talking about, or are those factual findings part of what we have before us? Your Honor, yes. This record is replete, if I may respond to your question. I got the question in before the red light. You can get your answer in now. This record is replete with both evidence and detailed factual findings by the magistrate judge that have been adopted by the district court on all fronts. And so briefly, for example, a report and recommendation denying remand and ask for two is in the record at 6223. No, what I'm talking about is what actually led to the sanctions. If that record that supports the various sanctions and whatever else has been awarded is just relying on the record that's already here in this court, you're saying that that's the case? Yes. On the decision of whether to sanction or not, Your Honor, the evidence that the court relied on to sanction is identical to the evidence the court used to determine realignment and the basis of diversity jurisdiction. All right, Mr. Vann. Thank you. Thank you, Your Honor. Judge Higginson, you started your questions asking about the summary judgments and if they were opposed. I think we heard a suggestion that they weren't. It's in the record that they were, the penalties and the attorney fees that was opposed. And I also want to be clear. I mean, what employer could genuinely oppose an employee who was their employee and who worked and did not get paid? How could you ever oppose entitlement to wages? Amount maybe, perhaps potential defenses, penalties, attorney's fees. But it's no surprise that the entitlement for workers who didn't get paid may not have been opposed. But ultimately, the summary judgments were opposed. You also asked counsel if there was a case where someone had settled, yet we saw the entry of judgments between supposedly settled parties. Of course, the answer to that question is no. It's fundamentally inconsistent with jurisdiction and with settlement. If you've settled, you would not have a case in controversy to later have the entry of judgments like we have here in this case. With respect to realignment, I mean, we obviously need to focus on what was the primary purpose of the suit. And I'd also point the court to the Texas Pacific case where this court has said that we cannot have realignment when there is any issue where the plaintiff needs some relief. And so we know that the plaintiffs had issues where they needed some relief against airframe. They fought for and got that relief in summary judgment, and there are judgments. So realignment is obviously not appropriate. We heard some comments about this being a second fight at the apple and questions about the Southwest Erector's case and the new factual basis. From what I recall in that case, the first removal there, there was no sort of factual development. It was a sort of venue-related challenge. So we saw that remand the first time because of venue problems. So there wasn't a real clarity. Richard Stewart wrote very much about that, and that was the first basis of remand, but he seems to have gone further than that and actually talks about whether the basis, not venue questions, but the basis for removal had changed. And I'm just not sure what to make of that and what the parties make of that as to what the standard is. What do you make as the standard for when new evidence can be considered that looks as if it's still supporting realignment? Well, a couple of points to that. So, I mean, in this case, to be clear, the magistrate judge, in her written opinion, is very clear that she is literally reconsidering and challenging what this court said in Ashford one. She views it as not a final judgment and puts it upon herself to respond. Well, in regards to that, rectors may allow her to do that. And so, I mean, I think the magistrate judge was saying that we now have evidence that gives a better view of what actually was going on. And I'm asking, what do you say the law is under, whether it's the rectors or something else, for how far this can be, I don't want to use the wrong word because it may be outcome determinative, reconsidered or otherwise under the same, I would say, theory that the parties are all, the non-diverse parties are all on the same part of the lawsuit. Well, you're right that I don't think the cases exactly articulate the full parameters of what is meant by that doctrine. Here, I think it goes to some of the questions earlier. There was no discovery done. This allegedly new evidence existed at that time and there were no discovery efforts made to learn it. Well, it was a pretty good effort to find out these things and some hiding of that information. So it's one way, I mean, the sanctions mean something that one party, not you necessarily, one party was not being forthcoming. Well, I certainly disagree with those characterizations. But then let me, I guess, point you back to the fact that the theory of the second notice of removal was settlement. That is clear. And so whether there's sort of alleged new factual basis, it was inappropriate for the magistrate judge to raise that herself and to try to undo or to challenge what this court said in Ashford one. The basis of the second notice of removal is settlement. And we obviously don't have a settlement here. We've been talking about us. What is the new evidence? Did any of it predate the lawsuit's filing? Predate? I thought the retainer agreement was the primary new evidence. I don't believe that the retainer agreement postdated the lawsuit. So that would go to a settlement theory. We've heard discussion about how Louisiana. And that was ATS's theory to come back up. They weren't saying we want to re-litigate Ashford one. They were saying, Judge Davis said, there may have been settlement after the lawsuit. And we've heard talk about how Louisiana law requires there to be a release. And we've also made several other arguments. Although they opposed that. You just heard him saying that's not the law. 37-1 doesn't require a release. Well, maybe the civil code article. The cases that we've cited do. And we had several other arguments on that, including, one, the existence of judgments proves there's no settlement. Vasquez requires someone to be effectively eliminated from the case. The judgments show that wasn't the case. Also, the cases say that settlement, if there was one, and this was not, but if there were, it cannot be extended by implication beyond what the parties intended. Here, all that was intended was a narrow subrogation agreement in exchange for a conflict waiver. And finally, we also pointed you to Louisiana law on suspensive conditions where what was potentially contemplated in that retention agreement never actually took place, so there was no obligation to begin with. So I see that my time has come to an end, so we'll ask the court to reverse. All right, counsel, thanks to all of you for bringing this to us. We'll take it under advisement.